FIRST DIVISION 
 SEPTEMBER 16, 1996

No. 1-96-0622

IN THE INTERESTS OF ) APPEAL FROM THE
M.K., E.K., K.J., D.H., A.B., ) CIRCUIT COURT
L.G., P.L., B.S., M.O., ) OF COOK COUNTY.
 )
 Minors-Petitioners-Appellants, )
 )
 v. )
 )
DANA L. CORMAN, Guardianship )
Administrator, Illinois Department )
of Child and Family Services, ) HONORABLE
 ) NANCY SIDOTE SALYERS,
 Respondent-Appellee. ) JUDGE PRESIDING.

 PRESIDING JUSTICE CAMPBELL delivered the opinion of the
court:
 Minor petitioners M.K., E.K., K.J., D.H., A.B., L.G., P.L.,
B.S. and M.O. appeal an order of the circuit court of Cook
County, dismissing their Emergency Supplemental Petition for
Findings of Neglect and Abandonment ("Emergency Supplemental
Petition"). B.S. and M.O. were not original petitioners, but
were included as petitioners by an agreed order dated June 14,
1995. P.L., J.W. and D.B. were original petitioners, but were
later stricken as petitioners without objection. 
 The record on appeal indicates the following facts. On
May 17, 1995, the minors, through the Cook County Public Guar-
dian, filed their Emergency Supplemental Petition. The minors
alleged they were all wards of the juvenile court placed under
the guardianship of Dana Corman, Guardianship Administrator for
the Department of Children and Family Services ("DCFS"). The
petition alleged that Corman had neglected and abandoned them by
allowing them to be kept in psychiatric institutions, despite
being advised by the respective hospitals that each of the
children were ready for discharge for at least four weeks. The
hospitals also allegedly warned Corman that the children were
deteriorating and suffering mental and emotional damage from
their continued institutionalization. The petition stated that
while the petition was brought on behalf of ten minors, "Corman's
neglect and abandonment of her wards at psychiatric hospitals
[was] a widespread and longstanding practice."
 The petition alleged that Corman's acts or omissions vio-
lated provisions of the Juvenile Court Act (705 ILCS 405/1-1 et
seq. (West 1992)), the Mental Health and Developmental Disabil-
ities Code (405 ILCS 5/1-1 et seq. (West 1992)), the DCFS Enab-
ling Act (20 ILCS 505/1 et seq. (West 1992)), the Illinois Con-
stitution of 1970 and the United States Constitution. The
petitioners requested that the trial court enter findings that
Corman had neglected and abandoned the petitioners. The petition
also sought an order of protection or, in the alternative, an
order of mandamus requiring Corman to remove the petitioners from
psychiatric hospitals and place them in appropriate settings. 
Finally, the petition prayed for such further relief as the court
deemed just and equitable.
 A copy of the Emergency Supplemental Petition was hand-
delivered to Corman's counsel on May 17, 1995. A Notice of
Emergency Supplemental Petition stated that the petition would be
presented on May 23, 1995. The transcript of proceedings for
May 23, 1995, indicates that Corman filed a special and limited
appearance, arguing that the Emergency Supplemental Petition was
in fact a new pleading alleging conduct for which she was en-
titled to service and an opportunity to respond. Corman also
moved to dismiss the petition for failing to state a claim for
which relief could be granted. Corman also moved to transfer the
cases back to the calendars to which each case had been assigned.
 The trial court acknowledged that the Emergency Supplemental
Petition was really a new cause of action naming Corman as the
respondent. Nevertheless, the trial court stated that it would
exercise its discretion to allow all of the cases to remain
before the court in a consolidated fashion. The trial court also
stated that each case would remain on its old geographic calendar
and would be considered consolidated only on the "very narrow"
issue of the psychiatric confinement. The trial court further
stated that any orders entered that day would be entered without
prejudice, as Corman's counsel had filed a special and limited
appearance. Corman's motions to dismiss were denied; the trial
court ordered the parties to submit affidavits containing the
details of the allegations as to each petitioner.
 The case was then continued to June 6, 1995, at which time
the trial court read the provisions of an agreed order into the
record, following an off-the-record conference. The trial court
entered a written copy of the agreed order on June 14, 1995. The
agreed order required the Director of DCFS to discharge each of
the named petitioners from psychiatric hospitalization and place
each of them in an appropriate setting other than a shelter by
July 21, 1995. The Director of DCFS was ordered to name a repre-
sentative responsible for responding to and addressing concerns
of the Public Guardian relating to the psychiatric hospitaliza-
tion of DCFS wards who are clients of the Public Guardian by
July 6, 1995. The Director of DCFS was ordered to name a repre-
sentative responsible for notifying hospitals at which such wards
are placed of the representative's name and telephone number by
August 7, 1995. 
 On August 7, 1995, the Director also was to submit a proto-
col for addressing "systemic issues affecting DCFS wards at hos-
pitals," including that: (1) DCFS receive notice of discharge
and staffing dates; (2) DCFS attend staffing meetings at psychi-
atric hospitals; (3) DCFS be able to ascertain discharge dates
and respond in a timely manner; (4) when appropriate placement
exists out-of-state and not in Illinois, that wards will not
remain hospitalized while in-state possibilities are exhausted;
(5) DCFS wards are promptly discharged to appropriate placements
once clinically ready for discharge; and (6) DCFS promptly ad-
dress requests for consent to treatment for DCFS wards in psychi-
atric hospitals. The agreed order further provided that nothing
in the protocol shall conflict with the consent decree entered in
B.H. v. McDonald, No. 88 C 5599, in the federal district court
for the Northern District of Illinois, which was signed on
December 21, 1991. The order further stated that the protocol
was to be developed with input from the Public Guardian.
 The agreed order also provided that the trial court would
retain jurisdiction over the matter. In addition, the matter was
continued to August 1, 1995, for a DCFS report on the issues
listed in the order. Finally, the agreed order continued Cor-
man's special and limited appearance.
 The record indicates that the hearing was later continued to
August 8, 1995.
 On August 1, 1995, Corman's counsel submitted a report on
the status of the nine minors listed in the agreed order. 
Although not required to do so, the petitioners submitted a
report the same day. The petitioners' report states that with
two exceptions, the petitioners were removed from hospitalization
and placed in less restrictive settings by the July 21, 1995,
deadline specified in the agreed order. The petitioners' report
also states that the Public Guardian agreed to an extension of
time as to the remaining minors, who were placed by DCFS on
July 24 and 25, 1995. The petitioners then reported on 16
additional minors who were alleged to remain hospitalized past
their discharge dates. The Public Guardian did not move to add
these minors as parties to the litigation.
 The parties agree that Corman filed a proposed protocol on
August 8, 1995; however, neither party has identified where this
protocol appears in the record. On August 28, 1995, petitioners'
filed their "Objections to the DCFS Director's Proposed
Protocol," which refers to a separate motion to have the juvenile
court adopt a protocol submitted by petitioners on August 1,
1995, or for an evidentiary hearing on their protocol and the
DCFS Director's alleged non-compliance with the agreed order. 
 The petitioners alleged that "[i]n the DCFS Summary, *** the
Director candidly concedes he has no intention of altering
business as usual ***." The petition purports to quote the
Director as stating that it would be derelict for the DCFS to
change its course "four years into the planning of a statewide
comprehensive system." The petitioners alleged that DCFS was
violating the spirit and letter of the agreed order and that its
protocol was developed without input from the Public Guardian. 
The petitioners attached a number of affidavits, including those
of health professionals experienced in working with DCFS wards,
stating that DCFS was not fulfilling the terms of the agreed
order or the DCFS proposed protocol.
 Though the parties do not identify where the petitioners'
proposed protocol appears in the record, the petitioners' 
objections refer to some of the requirements of that proposed
protocol. The petitioners proposed that a full-time DCFS repre-
sentative be physically present at each facility serving DCFS
wards. Each representative would be required to have full
placement and consent authority and expertise in the specialized
problems of DCFS wards. These representatives would closely
monitor each minor's progress, attend all staffings and be
involved in all aspects of discharge planning.
 On August 29, 1995, DCFS filed a response to the peti-
tioners' objections. That same day, Corman filed a supplemental
motion to dismiss pursuant to section 2-619 of the Code of Civil
Procedure ("Code")(735 ILCS 5/2-619 (West 1992)). Relying on
this court's decision in Katherine M. v. Ryder, 254 Ill. App. 3d
479, 627 N.E.2d 42 (1993), Corman argued that the case should be
dismissed as moot under section 2-619(a)(9) and due to the
pendency of the federal B.H. litigation pursuant to section 2-
619(a)(3). Corman supported her motion with correspondence
between the Public Guardian, the federal district judge assigned
to the B.H. case, the federal court-appointed monitor in the B.H.
case and representatives of the class in that case. These
letters indicate that paragraph 36(c) of the consent decree
entered in B.H. addresses psychiatric hospitalization of DCFS
wards. A letter from private counsel for DCFS to the judge in
the B.H. case states that
 "from March 1994 through June 1995, a total
 of 1,863 children statewide were admitted to
 psychiatric hospitals with only 6%, 116 chil-
 dren, remaining in the hospital beyond the
 date they were identified as medically ready
 for discharge."
 During a hearing on the matter held on August 29, 1995, the
petitioners attempted to submit another report identifying six
additional minors who were hospitalized beyond the date they were
ready for discharge. The trial court refused to accept the
report, but stated that it would accept petitioners' word that
there were six such minors for the purpose of determining that
this was a widespread problem. The trial court then set a
briefing schedule for the outstanding motions in the case.
 On September 19, 1995, the petitioners filed a third report
identifying four additional minors. Again, the Public Guardian
did not seek to add these minors as parties to the litigation.
 Following the submission of memoranda and supporting mater-
ials on the matter, the trial court held a hearing on the motions
on January 18, 1996. The petitioners attempted to file a fourth
report naming 21 additional minors. The trial court sustained an
objection to the filing of the report as none of the additional
minors named by the petitioners was before the court. However,
the trial court stated it would consider the information in the
report as relevant to the overall issue of placement. After
considering the petitioners' argument that DCFS had waived any
objection to the jurisdiction of the court by entering into the
agreed order, the trial court granted the motion to dismiss based
on the pendency of the B.H. litigation.
 On February 14, 1996, petitioners filed a motion to supple-
ment the record with the docket and selected documents from the
B.H. litigation. The trial court denied this motion on Febru-
ary 20, 1996. Petitioners now appeal.

 I
 The sole issue on appeal is whether the trial court erred in
granting the section 2-619 motion to dismiss. Initially, peti-
tioners argue that the respondent waived her right to file the
motion. Petitioners argue that the motion was untimely. Section
2-619 provides that a motion to dismiss may be brought "within
the time for pleading." (735 ILCS 5/2-619(a) (West 1992).) 
Petitioners did not raise this argument in the trial court, which
itself results in waiver. 
 Moreover, the trial court has the discretion to allow the
filing of a tardy motion to dismiss. (In re Custody of McCarthy,
157 Ill. App. 3d 377, 380, 510 N.E.2d 555, 557 (1987).) In
dismissing the action, the trial court acknowledged that it "did
allow quite a bit [of] latitude in terms of these pleadings." 
The record suggests that such a characterization is an under-
statement. Given the unorthodox procedures followed throughout
this litigation, the trial court did not abuse its discretion in
hearing the motion to dismiss.
 Petitioners also claim that the Director of DCFS has waived
his claim that the case should be dismissed due to the pending
B.H. litigation by entering into the agreed order. It must be
noted that the Director is not a named party in this matter. In
addition, the agreed order is not signed by any respondent. How-
ever, based on statements in the respondent's brief, it appears
that the order was agreed to by someone with authority at DCFS.
 In Illinois, an agreed order is not a judicial determina-
tion of the parties' rights, but rather is a recordation of the
agreement between the parties. (Kandalepas v. Economou, 269 Ill.
App. 3d 245, 252, 645 N.E.2d 543, 548 (1994).) Petitioners offer
no reason why enforcement of the parties' agreement is not
subject to the same section 2-619(a)(3) objection, particularly
as the agreement here explicitly states that nothing in the
agreement shall conflict with or supersede the B.H. litigation. 
Given the record on appeal, the primacy of the B.H. litigation
remained as an issue in this case, even after the entry of the
agreed order. Thus, the existence of the agreed order does not
waive the section 2-619(a)(3) objection. Accordingly, this court
turns to address the merits of the appeal.
 II
 The trial court dismissed this matter pursuant to section
2-619(a)(3) of the Code, which provides for dismissal whenever
"there is another action pending between the same parties for the
same cause." (735 ILCS 5/2-619(a)(3) (West 1992).) Section
2-619(a)(3) is designed to avoid duplicative litigation and is to
be applied to carry out that purpose. (Kellerman v. MCI Telecom-
munications Corp., 112 Ill. 2d 428, 447, 493 N.E.2d 1045, 1053
(1986).) Nevertheless, section 2-619(a)(3) does not mandate
automatic dismissal. Rather, the decision to grant or deny
defendant's section 2-619(a)(3) motion falls within the discre-
tion of the trial court. (Kellerman, 112 Ill. 2d at 447, 493
N.E.2d at 1053.) The factors that a court should consider in
deciding whether to dismiss an action pursuant to section
2-619(a)(3) include: (1) comity; (2) the prevention of multi-
plicity, vexation, and harassment; (3) the likelihood of obtain-
ing complete relief in the foreign jurisdiction; and (4) the res
judicata effect of a foreign judgment in the local forum. 
Kellerman, 112 Ill. 2d at 447-48, 493 N.E.2d at 1053-54.
 In this case, the trial court concluded that its decision
was controlled by Katherine M. v. Ryder, 254 Ill. App. 3d 479,
627 N.E.2d 42 (1993). In Katherine M., the Public Guardian filed
a class action on behalf of children who were in custody of the
DCFS, and who were or would be sexual abuse victims or perpetra-
tors while in DCFS custody, seeking a determination as to the
adequacy of DCFS placement and supervision procedures. This
court held that the trial court should have dismissed the case
because it involved the "same cause" and the "same parties" as
the B.H. litigation. (Katherine M., 254 Ill. App. 3d at 487-88,
627 N.E.2d at 48.) This court also noted the Public Guardian's
repeated unsuccessful attempts to intervene in the B.H. litiga-
tion and to file parallel actions in federal court. Katherine
M., 254 Ill. App. 3d at 484 n.5, 627 N.E.2d at 46 n.5.
 On appeal, petitioners offer a number of arguments why
Katherine M. should not control the outcome of this case. 
 A
 Petitioners argue that the trial court's dismissal amounts
to an abandonment of its parens patriae responsibilities. 
However, those responsibilities were just as real when Katherine
M. was decided; this court held that the trial court there erred
in not dismissing the case, despite the fact that the B.H.
consent decree had yet to be implemented. Thus, petitioners'
argument does not distinguish this case from Katherine M.
 B
 Second, petitioners argue that the issues in this case are
inherently state court questions. In claiming that the case
presents "federalism problems," the Public Guardian quotes Judge
Easterbrook's concurrence to a recent opinion in the B.H. litiga-
tion:
 "The ACLU, which commenced this suit in the
 name of the neglected children of Illinois,
 believes that the Illinois legislature has
 acted unwisely -- that it has been too stingy
 with money and has given DCFS the wrong set
 of priorities. The ACLU and the DCFS do not
 necessarily agree on the right way to handle
 the needs of children, but they coincide in
 thinking that the legislative solution is the
 wrong one. So they assented to moving the
 subject from the legislature's province to
 their own. The legislature of Illinois was
 not consulted about, and did not accede to,
 this allocation of power -- and, even if the
 legislature had consented, the judge should
 not have been an accomplice to the transfer
 of a political question to a judicial tribu-
 nal." (B.H. v. McDonald, 49 F.3d 294, 301-02
 (7th Cir. 1995) (Easterbrook and Goodwin,
 J.J., concurring).)
The Public Guardian apparently does not realize that these
sentiments undermine, rather than support, the petitioners'
position. The quoted passage addresses separation of powers
concerns more than federalism concerns. The concurrence suggests
that issues of the sort presented in this case are better re-
solved by the Illinois legislature than by a court. It does not
suggest that the issue is better resolved by two courts. Rather,
Kellerman requires this court to consider comity and the preven-
tion of a multiplicity of suits; these factors weigh in favor of
the trial court's decision in this case.
 C
 Petitioners' strongest argument is one that they do not
expressly raise in their initial brief, but do so implicitly
throughout their brief. Petitioners often mention the lack of
progress in the B.H. litigation as a reason why the trial court
should not have dismissed this case. As noted earlier, the
Kellerman court states that the trial court should consider the
likelihood of obtaining complete relief in the foreign jurisdic-
tion in deciding the motion. Moreover, it is on this point that
petitioners can most plausibly argue that circumstances have
changed since the Katherine M. decision.
 Petitioners are correct in their assertion that this court
may take judicial notice of the records in the B.H. litigation. 
However, when those records are examined in the context of the
record on appeal, the chronology of events is revealing. For
example, the B.H. docket submitted by petitioners showed that as
of January 31, 1996, the final entry on that docket is May 9,
1995. Petitioners' brief quotes the 1995 Seventh Circuit opinion
to support its contentions regarding the failures of the B.H.
decree:
 "Now, three years [after approval of the
 consent decree], all sides agree that the
 DCFS has failed to meet its obligations under
 the consent decree. The DCFS has consistent-
 ly failed to deliver plans for effecting real
 change and has missed the deadlines set out
 in the consent decree." (B.H., 49 F.3d at
 295.)
Yet the 1995 B.H. opinion later states that in the fall of 1993,
the parties and the district judge agreed to hold in-chambers
hearings in addition to open court status hearings; the judge
found that the parties had been reluctant to negotiate in public
due to concern over bad press reports. (B.H., 49 F.3d at 295-
96.) "The decision to close the conferences aroused the ire of
[Public Guardian] Patrick Murphy, who had earlier sought unsuc-
cessfully to intervene." (B.H., 49 F.3d at 296.) Accordingly,
in February 1994, Murphy again moved to intervene and to request
that all future proceedings be conducted in public. (B.H., 49
F.3d at 297.) The district court denied these motions. The
Seventh Circuit affirmed. The Seventh Circuit denied a motion
for rehearing and rehearing en banc on April 7, 1995.
 Given these circumstances, it is not surprising that the
final entry on the B.H docket is a status hearing held on May 9,
1995, continuing the matter until September 1995. Indeed, the
penultimate entry on the B.H. docket was the return of the record
on appeal to the district court. 
 Moreover, the record in this case contains correspondence
among the parties to the B.H. litigation, the district judge and
the court-appointed monitor (who apparently resigned as of
January 1, 1996). It was in this correspondence that private
counsel for DCFS wrote to the district judge that from March 1994
through June 1995, only six percent of the children admitted to
psychiatric hospitals were untimely discharged. Such counsel
would appear to be under an ethical obligation regarding the
truthfulness of such a statement. See Ill. Sup. Ct. RPC Rs. 3.3,
4.1 (West 1992).
 In this case, the Public Guardian maintains that there has
been no progress in the B.H. litigation for over a year, and
notes that there are other minors who have not been timely
discharged. However, it must be noted that the B.H. litigation
is far broader and addresses many more issues than the litigation
contemplated here. Thus, the characterization of the efforts in
the B.H. litigation through late 1995 as a failure does not
require the conclusion that those efforts have failed in every
respect on every issue. In this case, the Public Guardian does
not (and did not) dispute the accuracy of the DCFS materials
recently claiming a 94% success rate regarding the particular
issue raised in the Emergency Supplemental Petition. 
 No one wants any child to remain in a psychiatric facility
beyond the date upon which they are ready for discharge. The
materials submitted in this case support the common sense notion
that untimely discharge generally is not in the best interest of
minors. Even a six percent untimely discharge rate falls six
percent short of the ideal. Nevertheless, the Public Guardian
has failed to demonstrate that the federal forum has been inef-
fective in addressing the particular issue presented here or that
the parties in B.H. have abandoned their efforts to reform DCFS. 
Accordingly, viewing the record in light of Kellerman and
Katherine M., we conclude that the trial court did not abuse its
discretion in ruling that Katherine M. was controlling authority
in this case.
 For all of the aforementioned reasons, the judgment of the
circuit court of Cook County is affirmed.
 Affirmed.
 BUCKLEY, J., and WOLFSON, J., concur.