672 N.E.2d 271 (1996)
284 Ill. App.3d 449
219 Ill.Dec. 763
In re M.K. (M.K., et al., Minors-Petitioners-Appellants,
v.
Dana L. Corman, Guardianship Administrator, Illinois Department of Child and Family Services, Respondent-Appellee.
No. 1-96-0622.
Appellate Court of Illinois, First District, First Division.
September 16, 1996.
Rehearing Denied November 22, 1996.
*272 Patrick T. Murphy, Cook County Public Guardian (Lee Ann Lowder, Peter J. Schmiedel, Charles P. Golbert and Maura McMahon Zeller, Assistant Public Guardians, of counsel), for Appellants.
James E. Ryan, Attorney General and Barbara A. Preiner, Solicitor General, State of Illinois (Susan Frederick Rhodes, Assistant Attorney General, of counsel), for Appellee.
Presiding Justice CAMPBELL delivered the opinion of the court:
Minor petitioners M.K., E.K., K.J., D.H., A.B., L.G., P.L., B.S. and M.O. appeal an order of the circuit court of Cook County, dismissing their Emergency Supplemental Petition for Findings of Neglect and Abandonment ("Emergency Supplemental Petition"). B.S. and M.O. were not original petitioners, but were included as petitioners by an agreed order dated June 14, 1995. P.L., J.W. and D.B. were original petitioners, but were later stricken as petitioners without objection.
The record on appeal indicates the following facts. On May 17, 1995, the minors, through the Cook County Public Guardian, filed their Emergency Supplemental Petition. The minors alleged they were all wards of the juvenile court placed under the guardianship of Dana Corman, Guardianship Administrator for the Department of Children and Family Services ("DCFS"). The petition alleged that Corman had neglected and abandoned them by allowing them to be kept in psychiatric institutions, despite being advised by the respective hospitals that each of the children were ready for discharge for at least four weeks. The hospitals also allegedly warned Corman that the children were deteriorating and suffering mental and emotional damage from their continued institutionalization. *273 The petition stated that while the petition was brought on behalf of ten minors, "Corman's neglect and abandonment of her wards at psychiatric hospitals [was] a widespread and longstanding practice."
The petition alleged that Corman's acts or omissions violated provisions of the Juvenile Court Act (705 ILCS 405/1-1 et seq. (West 1992)), the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-100 et seq. (West 1992)), the DCFS Enabling Act (20 ILCS 505/1 et seq. (West 1992)), the Illinois Constitution of 1970 and the United States Constitution. The petitioners requested that the trial court enter findings that Corman had neglected and abandoned the petitioners. The petition also sought an order of protection or, in the alternative, an order of mandamus requiring Corman to remove the petitioners from psychiatric hospitals and place them in appropriate settings. Finally, the petition prayed for such further relief as the court deemed just and equitable.
A copy of the Emergency Supplemental Petition was hand-delivered to Corman's counsel on May 17, 1995. A Notice of Emergency Supplemental Petition stated that the petition would be presented on May 23, 1995. The transcript of proceedings for May 23, 1995, indicates that Corman filed a special and limited appearance, arguing that the Emergency Supplemental Petition was in fact a new pleading alleging conduct for which she was entitled to service and an opportunity to respond. Corman also moved to dismiss the petition for failing to state a claim for which relief could be granted. Corman also moved to transfer the cases back to the calendars to which each case had been assigned.
The trial court acknowledged that the Emergency Supplemental Petition was really a new cause of action naming Corman as the respondent. Nevertheless, the trial court stated that it would exercise its discretion to allow all of the cases to remain before the court in a consolidated fashion. The trial court also stated that each case would remain on its old geographic calendar and would be considered consolidated only on the "very narrow" issue of the psychiatric confinement. The trial court further stated that any orders entered that day would be entered without prejudice, as Corman's counsel had filed a special and limited appearance. Corman's motions to dismiss were denied; the trial court ordered the parties to submit affidavits containing the details of the allegations as to each petitioner.
The case was then continued to June 6, 1995, at which time the trial court read the provisions of an agreed order into the record, following an off-the-record conference. The trial court entered a written copy of the agreed order on June 14, 1995. The agreed order required the Director of DCFS to discharge each of the named petitioners from psychiatric hospitalization and place each of them in an appropriate setting other than a shelter by July 21, 1995. The Director of DCFS was ordered to name a representative responsible for responding to and addressing concerns of the Public Guardian relating to the psychiatric hospitalization of DCFS wards who are clients of the Public Guardian by July 6, 1995. The Director of DCFS was ordered to name a representative responsible for notifying hospitals at which such wards are placed of the representative's name and telephone number by August 7, 1995.
On August 7, 1995, the Director also was to submit a protocol for addressing "systemic issues affecting DCFS wards at hospitals," including that: (1) DCFS receive notice of discharge and staffing dates; (2) DCFS attend staffing meetings at psychiatric hospitals; (3) DCFS be able to ascertain discharge dates and respond in a timely manner; (4) when appropriate placement exists out-of-state and not in Illinois, that wards will not remain hospitalized while in-state possibilities are exhausted; (5) DCFS wards are promptly discharged to appropriate placements once clinically ready for discharge; and (6) DCFS promptly address requests for consent to treatment for DCFS wards in psychiatric hospitals. The agreed order further provided that nothing in the protocol shall conflict with the consent decree entered in B.H. v. McDonald, No. 88 C 5599, in the federal district court for the Northern District of Illinois, which was signed on December 21, 1991. The order further stated that *274 the protocol was to be developed with input from the Public Guardian.
The agreed order also provided that the trial court would retain jurisdiction over the matter. In addition, the matter was continued to August 1, 1995, for a DCFS report on the issues listed in the order. Finally, the agreed order continued Corman's special and limited appearance.
The record indicates that the hearing was later continued to August 8, 1995.
On August 1, 1995, Corman's counsel submitted a report on the status of the nine minors listed in the agreed order. Although not required to do so, the petitioners submitted a report the same day. The petitioners' report states that with two exceptions, the petitioners were removed from hospitalization and placed in less restrictive settings by the July 21, 1995, deadline specified in the agreed order. The petitioners' report also states that the Public Guardian agreed to an extension of time as to the remaining minors, who were placed by DCFS on July 24 and 25, 1995. The petitioners then reported on 16 additional minors who were alleged to remain hospitalized past their discharge dates. The Public Guardian did not move to add these minors as parties to the litigation.
The parties agree that Corman filed a proposed protocol on August 8, 1995; however, neither party has identified where this protocol appears in the record. On August 28, 1995, petitioners' filed their "Objections to the DCFS Director's Proposed Protocol," which refers to a separate motion to have the juvenile court adopt a protocol submitted by petitioners on August 1, 1995, or for an evidentiary hearing on their protocol and the DCFS Director's alleged non-compliance with the agreed order.
The petitioners alleged that "[i]n the DCFS Summary, * * * the Director candidly concedes he has no intention of altering business as usual * * *." The petition purports to quote the Director as stating that it would be derelict for the DCFS to change its course "four years into the planning of a statewide comprehensive system." The petitioners alleged that DCFS was violating the spirit and letter of the agreed order and that its protocol was developed without input from the Public Guardian. The petitioners attached a number of affidavits, including those of health professionals experienced in working with DCFS wards, stating that DCFS was not fulfilling the terms of the agreed order or the DCFS proposed protocol.
Though the parties do not identify where the petitioners' proposed protocol appears in the record, the petitioners' objections refer to some of the requirements of that proposed protocol. The petitioners proposed that a full-time DCFS representative be physically present at each facility serving DCFS wards. Each representative would be required to have full placement and consent authority and expertise in the specialized problems of DCFS wards. These representatives would closely monitor each minor's progress, attend all staffings and be involved in all aspects of discharge planning.
On August 29, 1995, DCFS filed a response to the petitioners' objections. That same day, Corman filed a supplemental motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure ("Code") (735 ILCS 5/2-619 (West 1992)). Relying on this court's decision in Katherine M. v. Ryder, 254 Ill. App.3d 479, 193 Ill.Dec. 883, 627 N.E.2d 42 (1993), Corman argued that the case should be dismissed as moot under section 2-619(a)(9) and due to the pendency of the federal B.H. litigation pursuant to section 2-619(a)(3). Corman supported her motion with correspondence between the Public Guardian, the federal district judge assigned to the B.H. case, the federal court-appointed monitor in the B.H. case and representatives of the class in that case. These letters indicate that paragraph 36(c) of the consent decree entered in B.H. addresses psychiatric hospitalization of DCFS wards. A letter from private counsel for DCFS to the judge in the B.H. case states that
"from March 1994 through June 1995, a total of 1,863 children statewide were admitted to psychiatric hospitals with only 6%, 116 children, remaining in the hospital beyond the date they were identified as medically ready for discharge."
*275 During a hearing on the matter held on August 29, 1995, the petitioners attempted to submit another report identifying six additional minors who were hospitalized beyond the date they were ready for discharge. The trial court refused to accept the report, but stated that it would accept petitioners' word that there were six such minors for the purpose of determining that this was a widespread problem. The trial court then set a briefing schedule for the outstanding motions in the case.
On September 19, 1995, the petitioners filed a third report identifying four additional minors. Again, the Public Guardian did not seek to add these minors as parties to the litigation.
Following the submission of memoranda and supporting materials on the matter, the trial court held a hearing on the motions on January 18, 1996. The petitioners attempted to file a fourth report naming 21 additional minors. The trial court sustained an objection to the filing of the report as none of the additional minors named by the petitioners was before the court. However, the trial court stated it would consider the information in the report as relevant to the overall issue of placement. After considering the petitioners' argument that DCFS had waived any objection to the jurisdiction of the court by entering into the agreed order, the trial court granted the motion to dismiss based on the pendency of the B.H. litigation.
On February 14, 1996, petitioners filed a motion to supplement the record with the docket and selected documents from the B.H. litigation. The trial court denied this motion on February 20, 1996. Petitioners now appeal.

I
The sole issue on appeal is whether the trial court erred in granting the section 2-619 motion to dismiss.[1] Initially, petitioners argue that the respondent waived her right to file the motion. Petitioners argue that the motion was untimely. Section 2-619 provides that a motion to dismiss may be brought "within the time for pleading." (735 ILCS 5/2-619(a) (West 1992).) Petitioners did not raise this argument in the trial court, which itself results in waiver.
*276 Moreover, the trial court has the discretion to allow the filing of a tardy motion to dismiss. (In re Custody of McCarthy, 157 Ill.App.3d 377, 380, 109 Ill.Dec. 687, 689, 510 N.E.2d 555, 557 (1987).) In dismissing the action, the trial court acknowledged that it "did allow quite a bit [of] latitude in terms of these pleadings." The record suggests that such a characterization is an understatement. Given the unorthodox procedures followed throughout this litigation, the trial court did not abuse its discretion in hearing the motion to dismiss.
Petitioners also claim that the Director of DCFS has waived his claim that the case should be dismissed due to the pending B.H. litigation by entering into the agreed order. It must be noted that the Director is not a named party in this matter. In addition, the agreed order is not signed by any respondent. However, based on statements in the respondent's brief, it appears that the order was agreed to by someone with authority at DCFS.
In Illinois, an agreed order is not a judicial determination of the parties' rights, but rather is a recordation of the agreement between the parties. (Kandalepas v. Economou, 269 Ill.App.3d 245, 252, 206 Ill.Dec. 538, 543, 645 N.E.2d 543, 548 (1994).) Petitioners offer no reason why enforcement of the parties' agreement is not subject to the same section 2-619(a)(3) objection, particularly as the agreement here explicitly states that nothing in the agreement shall conflict with or supersede the B.H. litigation. Given the record on appeal, the primacy of the B.H. litigation remained as an issue in this case, even after the entry of the agreed order. Thus, the existence of the agreed order does not waive the section 2-619(a)(3) objection. Accordingly, this court turns to address the merits of the appeal.

II
The trial court dismissed this matter pursuant to section 2-619(a)(3) of the Code, which provides for dismissal whenever "there is another action pending between the same parties for the same cause." (735 ILCS 5/2-619(a)(3) (West 1992).) Section 2-619(a)(3) is designed to avoid duplicative litigation and is to be applied to carry out that purpose. (Kellerman v. MCI Telecommunications Corp., 112 Ill.2d 428, 447, 98 Ill.Dec. 24, 32, 493 N.E.2d 1045, 1053 (1986).) Nevertheless, section 2-619(a)(3) does not mandate automatic dismissal. Rather, the decision to grant or deny defendant's section 2-619(a)(3) motion falls within the discretion of the trial court. (Kellerman, 112 Ill.2d at 447, 98 Ill.Dec. at 32, 493 N.E.2d at 1053.) The factors that a court should consider in deciding whether to dismiss an action pursuant to section 2-619(a)(3) include: (1) comity; (2) the prevention of multiplicity, vexation, and harassment; (3) the likelihood of obtaining complete relief in the foreign jurisdiction; and (4) the res judicata effect of a foreign judgment in the local forum. Kellerman, 112 Ill.2d at 447-48, 98 Ill.Dec. at 32-33, 493 N.E.2d at 1053-54.
In this case, the trial court concluded that its decision was controlled by Katherine M. v. Ryder, 254 Ill.App.3d 479, 193 Ill.Dec. 883, 627 N.E.2d 42 (1993). In Katherine M., the Public Guardian filed a class action on behalf of children who were in custody of the DCFS, and who were or would be sexual abuse victims or perpetrators while in DCFS custody, seeking a determination as to the adequacy of DCFS placement and supervision procedures. This court held that the trial court should have dismissed the case because it involved the "same cause" and the "same parties" as the B.H. litigation. (Katherine M., 254 Ill.App.3d at 487-88, 193 Ill. Dec. at 889, 627 N.E.2d at 48.) This court also noted the Public Guardian's repeated unsuccessful attempts to intervene in the B.H. litigation and to file parallel actions in federal court. Katherine M., 254 Ill.App.3d at 484 n. 5, 193 Ill.Dec. at 887 n. 5, 627 N.E.2d at 46 n. 5.
On appeal, petitioners offer a number of arguments why Katherine M. should not control the outcome of this case.

A
Petitioners argue that the trial court's dismissal amounts to an abandonment of its parens patriae responsibilities. However, those responsibilities were just as real when *277 Katherine M. was decided; this court held that the trial court there erred in not dismissing the case, despite the fact that the B.H. consent decree had yet to be implemented. Thus, petitioners' argument does not distinguish this case from Katherine M.

B
Second, petitioners argue that the issues in this case are inherently state court questions. In claiming that the case presents "federalism problems," the Public Guardian quotes Judge Easterbrook's concurrence to a recent opinion in the B.H. litigation:
"The ACLU, which commenced this suit in the name of the neglected children of Illinois, believes that the Illinois legislature has acted unwiselythat it has been too stingy with money and has given DCFS the wrong set of priorities. The ACLU and the DCFS do not necessarily agree on the right way to handle the needs of children, but they coincide in thinking that the legislative solution is the wrong one. So they assented to moving the subject from the legislature's province to their own. The legislature of Illinois was not consulted about, and did not accede to, this allocation of powerand, even if the legislature had consented, the judge should not have been an accomplice to the transfer of a political question to a judicial tribunal." (B.H. v. McDonald, 49 F.3d 294, 301-02 (7th Cir.1995) (Easterbrook and Goodwin, J.J., concurring).)
The Public Guardian apparently does not realize that these sentiments undermine, rather than support, the petitioners' position. The quoted passage addresses separation of powers concerns more than federalism concerns. The concurrence suggests that issues of the sort presented in this case are better resolved by the Illinois legislature than by a court. It does not suggest that the issue is better resolved by two courts. Rather, Kellerman requires this court to consider comity and the prevention of a multiplicity of suits; these factors weigh in favor of the trial court's decision in this case.

C
Petitioners' strongest argument is one that they do not expressly raise in their initial brief, but do so implicitly throughout their brief. Petitioners often mention the lack of progress in the B.H. litigation as a reason why the trial court should not have dismissed this case. As noted earlier, the Kellerman court states that the trial court should consider the likelihood of obtaining complete relief in the foreign jurisdiction in deciding the motion. Moreover, it is on this point that petitioners can most plausibly argue that circumstances have changed since the Katherine M. decision.
Petitioners are correct in their assertion that this court may take judicial notice of the records in the B.H. litigation. However, when those records are examined in the context of the record on appeal, the chronology of events is revealing. For example, the B.H. docket submitted by petitioners showed that as of January 31, 1996, the final entry on that docket is May 9, 1995. Petitioners' brief quotes the 1995 Seventh Circuit opinion to support its contentions regarding the failures of the B.H. decree:
"Now, three years [after approval of the consent decree], all sides agree that the DCFS has failed to meet its obligations under the consent decree. The DCFS has consistently failed to deliver plans for effecting real change and has missed the deadlines set out in the consent decree." (B.H., 49 F.3d at 295.)
Yet the 1995 B.H. opinion later states that in the fall of 1993, the parties and the district judge agreed to hold in-chambers hearings in addition to open court status hearings; the judge found that the parties had been reluctant to negotiate in public due to concern over bad press reports. (B.H., 49 F.3d at 295-96.) "The decision to close the conferences aroused the ire of [Public Guardian] Patrick Murphy, who had earlier sought unsuccessfully to intervene." (B.H., 49 F.3d at 296.) Accordingly, in February 1994, Murphy again moved to intervene and to request that all future proceedings be conducted in public. (B.H., 49 F.3d at 297.) The district court denied these motions. The Seventh Circuit affirmed. The Seventh Circuit denied a motion for rehearing and rehearing en banc on April 7, 1995.
*278 Given these circumstances, it is not surprising that the final entry on the B.H. docket is a status hearing held on May 9, 1995, continuing the matter until September 1995. Indeed, the penultimate entry on the B.H. docket was the return of the record on appeal to the district court.
Moreover, the record in this case contains correspondence among the parties to the B.H. litigation, the district judge and the court-appointed monitor (who apparently resigned as of January 1, 1996). It was in this correspondence that private counsel for DCFS wrote to the district judge that from March 1994 through June 1995, only six percent of the children admitted to psychiatric hospitals were untimely discharged. Such counsel would appear to be under an ethical obligation regarding the truthfulness of such a statement. See Ill.Sup.Ct.RPC Rs. 3.3, 4.1 (West 1992).
In this case, the Public Guardian maintains that there has been no progress in the B.H. litigation for over a year, and notes that there are other minors who have not been timely discharged. However, it must be noted that the B.H. litigation is far broader and addresses many more issues than the litigation contemplated here. Thus, the characterization of the efforts in the B.H. litigation through late 1995 as a failure does not require the conclusion that those efforts have failed in every respect on every issue. In this case, the Public Guardian does not (and did not) dispute the accuracy of the DCFS materials recently claiming a 94% success rate regarding the particular issue raised in the Emergency Supplemental Petition.
No one wants any child to remain in a psychiatric facility beyond the date upon which they are ready for discharge. The materials submitted in this case support the common sense notion that untimely discharge generally is not in the best interest of minors. Even a six percent untimely discharge rate falls six percent short of the ideal. Nevertheless, the Public Guardian has failed to demonstrate that the federal forum has been ineffective in addressing the particular issue presented here or that the parties in B.H. have abandoned their efforts to reform DCFS. Accordingly, viewing the record in light of Kellerman and Katherine M., we conclude that the trial court did not abuse its discretion in ruling that Katherine M. was controlling authority in this case.
For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.
Affirmed.
BUCKLEY and WOLFSON, JJ., concur.
NOTES
[1] Of course, subject matter jurisdiction is always at issue. This is particularly true in cases involving the juvenile court, which is governed by the rules of limited jurisdiction. (See In re M.M., 156 Ill.2d 53, 66, 189 Ill.Dec. 1, 9, 619 N.E.2d 702, 710 (1993).) Pursuant to Article XIII, section 4 of the Illinois Constitution, the General Assembly enacted the State Lawsuit Immunity Act (745 ILCS 5/1 (West 1992)), which generally provides that the State of Illinois shall not be made a party in the circuit court. The State can consent to suit, but only through the affirmative action of the General Assembly. (See, e.g., Brucato v. Edgar, 128 Ill.App.3d 260, 266, 83 Ill.Dec. 489, 494, 470 N.E.2d 615, 620 (1984) (and cases cited therein).) Whether an action is against the State "does not depend on the identity of the formal parties, but rather on the issues raised and the relief sought." (Senn Park Nursing Center v. Miller, 104 Ill.2d 169, 186, 83 Ill.Dec. 609, 618, 470 N.E.2d 1029, 1038 (1984).) Where a judgment operates to control the actions of the State, the action is effectively against the State and is barred by sovereign immunity. Currie v. Lao, 148 Ill.2d 151, 158, 170 Ill.Dec. 297, 300, 592 N.E.2d 977, 980 (1992); Hudgens v. Dean, 75 Ill.2d 353, 357, 27 Ill.Dec. 193, 195, 388 N.E.2d 1242, 1244 (1979).

Although this court rejected a claim of sovereign immunity by a prior Guardianship Administrator and a Deputy Director of DCFS in In the Interest of V.H., 197 Ill.App.3d 52, 143 Ill.Dec. 751, 554 N.E.2d 686 (1990), in which the DCFS officials entered into an agreed order with the minor petitioners, it must be noted that the agreed order named those officials personally, rather than by title, as happened in this case. Moreover, V.H. was not an attempt to impose systemic reform on the DCFS. Furthermore, the minors in V.H. were in a position where their liberty interests were not protected, whereas the DCFS did place the children in this case in accord with the agreed order.
In Vogt v. Bartelsmeyer, 264 Ill.App.3d 165, 201 Ill.Dec. 753, 636 N.E.2d 1185 (1994), this court rejected sovereign immunity in a case involving enforcement of a settlement agreement. Bartelsmeyer, however, involved eminent domain issues which initially are not subject to litigation in the Court of Claims. See Herget National Bank v. Kenney, 105 Ill.2d 405, 86 Ill.Dec. 484, 475 N.E.2d 863 (1985).
In this case, the trial court dismissed the action once the liberty interests of the named minors were protected and it became clear that petitioners were seeking to control the actions of the State by seeking to impose their own proposed protocol. As this judgment did not operate to control the actions of the State, we need not reach the constitutional and statutory sovereign immunity question and address the merits of the dismissal.